Good morning. May it please the Court. My name is Ned Smock, and I represent Appellant Jose Calvillo-Alvarado. I'd like to try to reserve two minutes for rebuttal. I'm going to focus my argument today on the two significant procedural errors that the District Court committed during Mr. Calvillo-Alvarado's sentencing. First of all, the Court repeatedly indicated that it believed that it was constrained by Congress to apply this 16-level enhancement under 2L1.2 without questioning whether the resulting sentence was greater than necessary to comply with the sentencing purposes of 3553A. And here I want to emphasize a couple of instances where the Court's mistaken view was really most clearly expressed. First of all, early in the sentencing hearing, defense counsel said that the increase of the offense level under 2L1.2 was so – Which page are you at? I'm at page 13 and 14 of the excerpts of record, at which point I was referring to the increase of the offense level being so dramatic as to take the sentence beyond what's reasonable under 3553A. There, the Court specifically said, and I quote, that might be true, but that's Congress's prerogative. Defense counsel then said, well, Booker and his progeny say that the District Court should look beyond the guidelines to determine what a reasonable sentence is. And in response to that, the Court said, and I quote, it's not reasonable from my perspective to advocate the responsibility that Congress has given in terms of enforcing these laws. But I thought all the – what I thought the District Court was doing, looked to me, was that she was acknowledging the substantial enhancement within the guideline scheme. Just looking at the guidelines, she had to calculate the correct guideline that applied. And then after she did that, she could go to the 3553A factors. And I think that's all – I think that's all that she was saying, was that Congress had set this – had approved these guidelines, or the Commission had approved these guidelines that imposed a substantial enhancement. I think that's where I think it's important to recognize the arguments that the defense was making, both in the sentencing memorandum and at the hearing. Right. Which is, number one, there's this issue of a mesquavasquez, which says that under certain circumstances, if a prior qualifying offense is old or stale in the District Court's words, there might be a basis to vary from the guidelines range. But that's separate and apart from a different argument that the defense counsel was making, which was a policy-based argument that that 16-level enhancement goes too far. And you saw that at pages 11 to 15 of the government's excerpts of record, which is our defense sentencing memorandum. But under the guidelines, once she determined that he had suffered a prior conviction that qualified, it was a 16-level enhancement. Right. But the point is that we made several arguments that while the Court can start from the guidelines, which is entirely appropriate under the party, that the Court is then entitled under Kimbrough and its progeny to question whether the resulting sentence is reasonable under 3553A. And what the Court did repeatedly is indicate that it did not believe that it had the authority to question on a policy level that 16-level enhancement. Didn't she ask counsel, why shouldn't, you know, what, make an argument under 3553A? There were references to 3553A in the transcript, of course. But when you actually see the case that she understood 3553A. Well, what you have is references to the need to consider 3553A. But what I want to emphasize is that there's a real difference between saying that the Court understands it needs to consider 3553A and actually doing so. And when you look at the Court's actual expression of its understanding of its abilities under 3553A and under the guidelines, it's expressing a feeling that it's obliged by Congress and Congress's intent to apply that 16-level enhancement. You see later in the sentencing proceeding the Court saying, I understand, this is at page 14 of the excerpts of record, I understand that I can vary based on the age of the offense pursuant to a mesco-vazquez, but, quote, to suggest that, well, you know it's a very severe increase and it's beyond the pale, that's not within my province to reach that conclusion, not as a general rule. Later in the sentencing proceeding when defense counsel was suggesting that the 3553A factors suggested that that 16-level enhancement resulted in a sentence beyond what is consistent with the statute, the Court said, and I quote, are you asking me to usurp Congress's authority? I mean, you're saying I don't think it's as serious as Congress has told you that it is. That's at 33 and 34 of the excerpts of record. Now, these are statements that would have been appropriate pre-Booker. But what we're seeing here is a Court that it misunderstands the leeway that it has after Booker and considering Kimbrough. So I'm wondering how this could fit in with this statement by the district court at ER18, I am inclined to listen to reasons why the Court should reason that a 9-year-old felony, comma, violent crime, comma, should be treated in a certain way relative to the 16-level enhancement. I mean, she's conscious of that. She's considering the argument. She decides against it. What more can we ask of the judge? A couple of points in response to that, Your Honor. I think this gets back to the distinction between the two arguments that I made before the district court. First of all, we can see that the Court considered the amezcua v. asqua as the issue of the age of the qualifying prior. I can get into the problems that we had with the Court's doing that, especially with respect to its reference to the Federal Rules of Evidence and the criminal history section of the Guidelines. And there are a number of points in which the Court suggested that it believed that that 10-year cutoff was Congress's intent, and that it was bound by that. But that's separate and apart from the point that we were making a Kimbrough-related challenge, a policy-related challenge to 2L1.2, and you see that in our sentencing memorandum and in the argument. And Kimbrough says a district court has the ability to vary from the Guidelines based on a policy disagreement with them. And it's in response to those arguments that the Court repeatedly indicated that that was Congress's prerogative. She couldn't abdicate the responsibility that Congress put on her, and it wasn't in her province to reach that conclusion. So what you see is there is an appropriate addressing of the argument under amezcua v. asqua, but with respect to the larger argument that that plus-16 enhancement results in a sentence that's beyond what's required under 3553A and results in a sentence that's more than necessary under 3553A, you see there that the Court clearly erred because it indicates that it believes that that would amount to usurping Congress's authority. And that's a clear abuse of discretion, and on that basis alone, I think this case needs to be remanded to the district court. But I wanted to address the issue of amezcua v. asqua because the Court raised it, and we acknowledge that the Court did address it, but what it did at that point was try to determine what — how stale an offense needs to be before you can start reducing a person's sentence. The Court referred to the Federal Rules of Evidence and to the Criminal History section of the Sentencing Guidelines in doing so. And I want to be clear that we have no quarrel with a district court referring to those things as reference points. The problem that we see is that the Court then jumped from that point to determining that it believed that that was an expression of Congress's intent, that it was bound to follow. The Court at the excerpts of record 28 and 29 says, From my perspective, the evidence code and the guidelines themselves tell me that Congress has decided that a conviction until it's 10 years old is still probative, it still has probative value. Later, at 30, page 31, it says we're dealing with specific numbers, and those are the numbers that Congress has provided, and those are the numbers that I have to consider. At the end, the Court, at page 33, says, so it gets a 16-level enhancement because that's what I conclude Congress intended. So here we have clear evidence that what the Court was doing was basically like it was saying. Breyer, you just passed over what she said right prior to that, which is, I think it's still serious, I think it's still probative. It's not stale. And her determination that it wasn't stale under Vazquez, then she was going to impose a 16-level enhancement. But her determination of what amounted to a stale prior conviction was based on her view of what Congress had authoritatively said. That's one way I guess you could read what she said, but it's as she seemed, the district court here really seemed to understand what she was supposed to do. Well, certainly not with respect to the Kimbrough policy-based challenge. I think it's absolutely clear, based on the numerous things the Court said in the record, that it didn't understand that it had the leeway to accept a policy-based challenge to that 16-level enhancement. Then with respect to Mezco-Vazquez, I think there are real concerns about the references to Congress's intent and that it eliminated. Ultimately, the Court ended up saying if a prior conviction is less than 10 years old, there's no basis for varying from the guidelines whatsoever, essentially eliminating any possibility for mitigating a sentence, however minimally.  So when you look at the record in this case and what the Court actually expressed with respect to its reasoning in this case, specifically with respect to this case, not generalities about 3553A, you see that the Court did not understand the leeway that it had under 3553A and that this case has to be reversed. Your time is up. Good morning. My name is Joshua Hill. I'm representing the United States. May it please the Court, the issue in this case is whether the district court abused its discretion in sentencing this defendant to a low-end sentence, a within-guideline sentence. And what the record makes clear in this case is that the district court followed the road map laid out by this Court in Carde in pronouncing Mr. Calvillo's sentence. First, the district court correctly calculated the guidelines, considered the 3553A factors, and pronounced a reasonable sentence. And in fact, this Court made several specific references to its consideration of the 3553A factors. Excerpt of record page 10, the Court mentioned her discretion to vary from the guidelines. Page 14, the Court said that it should assess each case under 3553A. Page 15, the Court asked the defense counsel how it should consider its arguments in varying from the guidelines. Page 18, the Court stated that it was inclined to listen to reasons why it should vary from the guidelines. Page 25, the Court said that the 3553A analysis is independent of what the 16-level enhancement. At page 29, the Court said, well, the next question I have for the parties is how do I consider 3553A factors? At page 33, again, the Court referred to 3553A factors. So the Court understood its discretion to vary. The Court understood Kimbrough. Now, Kimbrough does not state or does not stand for the proposition that the district court must agree with defense counsel's arguments as to any policy disagreement with the sentencing guidelines. In this case, the Court clearly considered the parties' arguments, had read the PSR, had read the sentencing memorandum, engaged in a lengthy exchange with defense counsel at sentencing, and pronounced a reasonable and appropriate sentence. And what where would you point to her explanation of the sentence? Well, the defense counsel had engaged in a exchange concerning the Emesqua-Vasquez case, and the Court was distinguishing Mr. Cavillo, this defendant, from Emesqua's case, Emesqua-Vasquez. And the Court stated, for example, that this is different from a case in which a person has come into this country to work or just to support his or her family. In this case, Mr. Cavillo had committed several crimes, including at least one violent crime. The Court heard argument concerning the fact that Mr. Cavillo had six prior deportations prior to this prosecution. Mr. Cavillo had been indicted and convicted and sentenced for the record. But where does she explain her own judgment? Well, the Court, towards the end of the sentencing hearing, page 46, I'm sorry, excerpt from record page 37, of course, they did consider the relevant sentencing guidelines to consider the parties' submissions had taken into account 3553A factors in pronouncing his sentence. Now, the Court is not required to tick off each factor. No, I'm asking you, where does she explain it? Will you tell me that? Well, Your Honor, I'm trying to do my job. Does she not explain it? You don't know where she explained it. The Court does not explicitly explain it. Does not explain it. You can say it. It's unexplained. No, but it's unexplained. Maybe we can guess. Well, the Court can find that in a typical case a lengthy explanation is not required. Now, certainly there's not a lengthy explanation. No, but an explanation is not required. An explanation is required. You're not able to point to an explanation. Why don't you concede it? I won't concede that point. When you're wrong, why not concede it? The totality of the sentencing hearing makes clear the point. Well, where does she do it? She does not explain it, right? Is that right? I'll concede. She does not explain the sentence. Can you say that? I can say that she does not explain the sentence. All right. That's the case. She does not explain it. I can guess how she arrived at it, but I'm not supposed to guess. Well, I don't think Your Honor has to guess because the Court did say that she had read the PSR, she read the parties' sentencing memoranda, she listened to counsel's arguments for some time during the sentencing hearing, and took that, and this Court's precedent states that the district court does not have to tick off each list. It is not for the Court to do that. No, it didn't, but it had to do something, and it didn't do anything, as you've conceded. It did nothing. So end the case. Go back. You can get the sentence again, perhaps. Were there other considerations besides the alleged staleness of the prior conviction? Well, there was an exchange, Your Honor, concerning Mr. Cavillo's deportation history. He had been deported six times prior to this case. He had been convicted of no, no, no, let me rephrase it. Let me back you up just a minute. Were there – did defense counsel make any other arguments with respect to the 3553A factors that would support a sentence that varied below the guideline range? The defense counsel had, I believe this is in ER 35, argued to the Court that Mr. Cavillo came to this country to find work, that he was young, that he had gone to school since through the sixth grade in Mexico, and that he was – had come to the United States to support his family to find a job. So that defense counsel hadn't made that argument during the citizen hearing. The district court listened to that argument and, in its discretion, decided that a low end within guideline sentence was appropriate in this case. Okay. If there are no further questions, I would ask that the Court affirm the sentence. Thank you. All right. One minute for rebuttal. I think the government is, of course, correct that Kimbrough does not oblige the district court to accept the defense's arguments with respect to policy issues. The problem is that Kimbrough requires the district court to recognize that it has that ability, and it didn't recognize that when it makes statements like, that's Congress's prerogative, not within my province. You're asking me to usurp Congress's authority. That's the clearest basis to reverse the sentence. But the Court is absolutely correct. The counsel didn't – didn't Judge Armstrong at page 2829 of the excerpt of the But in this case, the thing that persuades me most at this juncture, at least for the purposes of the 16-level enhancement, is that that is an objective indicator of seriousness. And from my perspective, the evidence code and the guidelines themselves tell me that Congress has decided the convision, unless it's 10 years old, is still prerogative. So she's talking about Amescua over there. But she's already stated that it persuades her at this junction, for the purposes of the 16-level enhancement, that it's an objective indicator of seriousness, the crime is. Isn't that sufficient explanation of how she gets to her sentence? No, because it first of all suggests that she believes she's bound by Congress with respect to that 10 years. No, no, no, she stops there. She says, for the purposes of the 16-level enhancement, is that that is an objective indicator of seriousness, period. And from my perspective, the evidence code, and then she talks about the 10-year-old Amescua issue. So I think she's dealing with two issues, one, 3553A, the seriousness of the crime, and B, too, that it's 10 years old or 9 years old. Respectfully, I believe that that's stretching the Court's logic beyond, I think, what she intended to mean. And when you look at the numerous statements throughout the record suggesting that she doesn't believe that she has discretion, that's the absolutely clear expression of her intent. Just a last point with respect to the fact that the Court didn't address the 3553A factors. In fact, the point that the government cited at page 37 of the excerpts of record, which reportedly would have amounted to explaining the Court's reasoning, is essentially taken verbatim from page 3 of the sentencing recommendation portion of the pre-sentence report. It's essentially reading from the pre-sentence report. So we have absolutely no addressing of the 3553A factors, despite that there were a number of non-prelude arguments raised on that. Roberts. Thank you. We appreciate counsel's argument, and the matter is submitted. Our next case for argument is United States of America v. United States of America v. Adolfo Sandoval-Galvez. Good morning. May it please the Court, if I could reserve 90 seconds for rebuttal. My name is James Park from Phoenix. I'm in here representing Adolfo Sandoval-Galvez, who is serving an 84-month sentence for conviction for illegal reentry after deportation. Since his arrest in April 11, 2009, he has been in continuous custody of the United States government, and he has approximately five and a half years left of the sentence that he was imposed by the district judge. The only issue that we have brought on appeal is the admission of Mr. Sandoval-Galvez's prior removals. In the indictment, the government alleged one prior removal, the most recent removal, which was March of 2009. The entry, the place of entry in that particular I-205 that the government used as a basis to support the conviction was from Texas. The defendant admitted that he entered through Texas, El Paso, Texas. The other prior bad acts or prior removals, all the entry points that the defendant admitted to in the I-205s was that they were all through either Calexico or San Isidro, and one other place, which was Andrade, that is closer to, of all the California entry points, Andrade is probably the closest to the Yuma area where Mr. Sandoval-Galvez was found. And how old was that conviction? The — I believe it was 2001 — well, I shouldn't say it was a conviction. It was a removal of 2001, was the Andrade entry. The — it's a very unique set of facts in an illegal reentry case. You have Border Patrol agents who find Mr. Sandoval-Galvez basically passed out approximately 1,500 feet or 300 yards in about a five-minute walk. Passed north of the international boundary. He was, in the words of Agent Lozano, that he had slurred speech, he could smell alcohol. In fact, they had to help Mr. Sandoval-Galvez walk because he couldn't properly walk on his own. And in fact, for 12 hours, they didn't even bother to really question him until another Border Patrol agent questioned him and obtained certain admissions. The issue before the court, Judge, is that the — the judge — district judge allowed eight prior removals as a prior bad act. Of those eight prior removals, five of them were more than 15 years old. And I understand that this — there is no right-line rule as how old can the government use or how old the prior bad act before the judge precludes the government from its use. I understand it is an abusive discretion standard. However, you have five which are more than 15 years old. You have the other — other — in deciding whether there should be 404B evidence should be admitted, there are four factors that district judges should consider. One of the factors is not in dispute. We know Mr. Sandoval-Galvez had prior removals. It was never contested. In fact, at trial, it was never contested. He did not contest his alienage. He did not contest his prior removal. The only issue was, how did I get here? He couldn't — Didn't the government have to prove knowledge that he knew? I believe using the 404B evidence. No. What was — what elements did the government have to prove? What did the government have to prove to get the jury to return a conviction? The government would have to prove that he knowingly entered the United States. It was a voluntary act. That he knew when he crossed the border, he did it knowingly, and that it was a voluntary act. Didn't he admit to the border agents that he was headed to Los Angeles and he knew it was illegal to cross into the United States? That is correct. Mr. Sandoval-Galvez did admit to Agent Mills, 12 hours later after he sobered up, that he did know that it was illegal to cross into the United States. And that he was headed toward Los Angeles. That is the evidence that came in. That's what was not contested. That is correct. If you're going to — well, is it a harmless error? I mean, if that's what you're going into, I don't — because the facts that were used was the prior removal orders were used by the government, eight of them, and five more than 15 years old, to basically pile it on to show knowledge. But if you look at this particular set of facts for the way Mr. Sandoval-Galvez was found in the United States, where he was intoxicated in the Arizona border, whereas all other prior removals, the entry point — except the Texas one, all the entry points were in California. And I think you have to show some nexus in order to meet one of the factors of the 404B test,  And here, you have a very unusual situation of somebody passed out, intoxicated near the border, whereas the other entries used by the government in the prior removals, there's no evidence how he committed those offenses. What was the circumstance? How did he enter? He just said, I entered through different places, through Calexico, San Ysidro, and Rodney. Now, when the officers came upon him, did he just cooperate? When the officer announced Border Patrol, it was 10 o'clock at night, he announced, he had his lights on, Border Patrol, Border Patrol, Border Patrol. After three times, according to Agent Lozano, Border Patrol Agent Lozano, Mr. Sandoval got up, took one or two steps, was going to fall down, except the Border Patrol grabbed him and kept him from falling down, then placed him onto the ground. So, it looked like he was somewhat incoherent, and he was running away from the Border Patrol after repeated attempts by Agent Lozano to announce himself. So, that's how he was found under those circumstances. The evidence against Mr. Sandoval Galvez was, what you're using is the 404B evidence. I mean, they really, if you have somebody, I mean, as a reasonable juror, as a juror, if you're thinking about the whole purpose behind 404B is not to allow propensity evidence. And when you have a situation where you've got somebody who's been coming across the border and using it for 25 years, over a period of 25 years, all that evidence is presented to the jury. The jury are going to, it's just only human nature to think, boy, 25 years, he's come across nine times. Well, he must have done it again. And he does not get a fair... The jury is instructed that he can use that testimony only on the issue of mistake? That is correct. There was a limiting instruction given. But it is essentially what ended up becoming was, I don't, I'm not alleging with the government's intent, but it actually ends up becoming a propensity evidence, which 404B was exclusively designed against. 404B exclusively says, hey, you can't use it as propensity evidence. But when you show somebody for 25 years, they've been across the border at different points, he's not going to, I mean, he's not going to get in fair shape. And that's what the whole reason why we have all these factors and all these rules designed not to use 404B evidence or to use it very limited is that we're afraid that a defendant will be punished not for the crime that he may have committed, but for all his past acts. I mean, that's what old chief talks about. And that's what the whole design of 404B was to preclude that situation. And that's when you ended up here, by allowing all these old... Which element of 404B, the four elements, do you think there was insufficient evidence so that Judge Bolton was in error and an abuse of discretion by allowing that evidence in? There were three factors that Judge Bolton failed to consider. We believe the two factors are intertwined. And that is the material point, which goes to the knowledge of the defendant, and the similarity. If you're trying to establish knowledge, there has to be similarity in the past conduct. Oh, you mean these prior acts would not be admissible unless they were at the geographical location where the defendant was found? I don't know that you can actually limit the geographical location. But I think you have to... The prior case that dealt with... Was the crime committed in such a way that it would show that the defendant, by committing those other acts, had gained knowledge? What knowledge would he have gained by crossing the borders in California versus crossing the border in Arizona? He gained the knowledge that he was in the United States. Well, I think you have to show that there has to be some kind of... Is there Internet? Is it the same geographic...  So you do say it's that same kind of terrain. Similar kind of terrain. Stinking across at San Diego is not the same as stinking across the Rio Grande at El Paso. I believe that is. I think there's a totally different geographic terrain, a different type of notices to the defendant as they cross the border. Do you have any cases that says that? No, Your Honor. I do not have cases that say that. Do you want to save the balance of your time for a little rebuttal? Thank you, Your Honor. Good morning, Your Honor. May it please the Court. My name is Jim Knapp, and I represent the United States, the appellee in this case. Did you try this case, by the way? I did. So why was it necessary to admit eight? Well, and here's the tension. I mean, isn't it like overkill? I submit the answer is no. It's not overkill. And I understand, I recognize that there is some tension between arguing, on the one hand, harmlessness, and on the other hand, this is really appropriate evidence that we want to get in. But each one of those prior illegal entries is probative of a very low standard that we're talking about here, knowledge that he's in the United States. And also it's probative of the, of where he's headed. It corroborates the admission that he made to the processing agent the morning after the apprehension that he was traveling to Los Angeles. And again, that's important because it wasn't just an unconfessed. Do you think one or two might have established the same point? One or two would have been probative, but I think the remainder are probative as well. And I think the curious thing about this is when, when you look at them, they are, many of them are old. I can see that. But it was over a period of time. There wasn't, they weren't clustered around 1.25 years ago. And if you, if you look at them, they, they happened over the course of this 25-year period. And if you look at them in the context of the PSR, it actually shows that, you know, there's, there's a lot of evidence that he was in high risk, most of the time  But there's also evidence that he was in high risk for criminal entries and removals can be justified because he was in penal custody during that time. He was incarcerated during that time. So I submit that each one of them is probative because each one of those alleges a California, a California entry, which corroborates the admission that he was traveling to Los Angeles. And each one of them, again, just shows one other instance where he crossed into the United States. He knew he was in the United States. He was apprehended. But I thought you had to, I thought you had to prove that at the time of this particular stop when he was apprehended, that he knew that he was in the United States. Yes, Your Honor. So this goes to show the familiarity with the border. And these were all along the southwest border. Granted, they were not in the exact geographical spots. But one of them was, one of the older ones, one of the second oldest illegal entry was in Andrade, which is just around the corner from where he was apprehended this time. Were all the other prior entries, did they all take place where there was no regular port of entry, sort of along, just along the border? There is a port of entry at — I believe there is a port of entry at San Ysidro and Calexico. But it was probably, you know, it wasn't through the processing area. We didn't get into the details of those, you know, the nature of the entry beyond just submitting the forms, the forms that document the prior entries. Now, again, what I was going to say about the tension between the harmlessness and the — that each one was probative, you know, this is a reentry case where sort of part of the crime is that the person has been removed and come back. So it's going to be prejudicial in a sense. And this particular case, the prior removal was a reinstatement. And that came into evidence, that it was based on a deportation even before that. And then once you start letting in a couple of them based on the fact that they do corroborate this admission of traveling to Los Angeles and they do show familiarity with the border, then it's just a matter of trying to say, well, was the sixth one too prejudicial? Was the seventh one too prejudicial? And the curious thing about that is each one, again, because they're spread out over a 25-year period, spread out. Each one is probative of his knowledge, his intent, his absence of mistake. And the prejudicial nature goes down to the point where it can't substantially outweigh the probative value once they've already heard that he's been removed multiple times. It's just, again, it's probative of the California connection and his knowledge of the border in many different spots. Kennedy. I'm having difficulty understanding why the proof of multiple entries reduces the prejudicial effect. Did you just say that a moment ago? I mean, or did I misunderstand you? I think what I'm trying to say is each additional one adds very little prejudicial effect, but it still continues to add probative value. And on the timing, I'll just note, again, assuming that, and as I argue, each one of these is probative, there is no rule about the timing of the other acts evidence. The rule is flexible, especially where there is similarity to the offense, to the prior bad act and what's trying to be proved. And on the harmlessness, I'll just note that there is no rule about the timing of the other acts. The other thing that I'm trying to say is that, again, the defendant did make some admissions the morning after, approximately 12 years after he'd been apprehended. He was conceitably intoxicated at the time he was apprehended, so the agents took him back to the processing station. He slept it off. He was interviewed. He showed no signs of intoxication to the agent. He admitted that he had entered illegally and that he was traveling to Los Angeles. There was one set of footprints from the river that the agents tracked, and that, again, just shows that the defense theory that he was dumped in as a drug decoy actually had no evidence in the record to support it. And there were photos of the brush from the river that were admitted at trial to show that this is not an area where you just accidentally stumble in. And there's also testimony at the trial that this is a common spot for illegal entrance because of the proximity to transportation. Unless the Court has any other – unless Your Honor has any other questions for me, I will – I'll submit it. Thank you very much for your time. Thank you. I think it actually has the opposite effect, Judge. The prohibitive value, as you add – you bring in more removal, prior removals, the prohibitive value is lessened. I mean, the point is already made by the government that he had prior removal. Secondly, the defendant was willing to concede that. But, however, the prejudice prong still continues to pile on even more. It's one thing if he had one prior removal, another two, another three. By the time you get to eight or nine, who's going to give the defendant a fair shake? Thank you, Your Honor. Thank you. The case is submitted at this time. Thank you.
judges: Noonan, Paez, Bea